IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NILS JOHANNESSEN                    :
                                    :          CIVIL ACTION
            v.                      :
                                    :          NO. 04-3791
SULZER MEDICA USA, INC., ET AL.     :


**SURRICK, J.**                                    **MAY ___20___, 2009**

## MEMORANDUM

Presently before the Court are the Motion of Defendants Sulzer Medica, Inc.,

Centerpulse, Inc., and Zimmer Holdings, Inc., for Summary Judgment (Doc. No. 46) and Plaintiff

Nils Johannessen's Memorandum of Law in Opposition to Zimmer's Motion for Summary

Judgement and in Support of his Motion for Partial Summary Judgment Against Zimmer

Holdings, Inc., Sulzer Medica USA, Inc., and Centerpulse USA, Inc. (Doc. No. 47).  For the

following reasons, Defendants' Motion for Summary Judgment will be granted and Plaintiff's

Motion for Partial Summary Judgment will be denied.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Nils Johannessen ("Plaintiff") began work as a Technical Sales Representative

with IntraTherapeutics, Inc. ("IntraTherapeutics") on November 9, 1998.  (Pl.'s Dep. 11, Nov.

13, 2006.)  Plaintiff held this position between November 1998 and June 2002.  (*Id*. at 12.)

During Plaintiff's tenure as a Technical Sales Representative, his employer changed its name

twice.  In January 2001, Sulzer Medica USA, Inc. ("Sulzer") acquired IntraTherapeutics and

renamed it.  In May 2002, Sulzer changed its name to Centerpulse USA, Inc. ("Centerpulse").[1]

---

[1] Zimmer Holdings, Inc. ("Zimmer") is another employer-defendant, although Plaintiff
never worked for Zimmer.  Defendants do not contest that Zimmer is the successor-in-interest to
the rights and obligations of the ERISA plan at issue in this case.  (*See* Doc. No. 46 at 3 n.3.)  We

Throughout Plaintiff's employment, his compensation included a base salary plus commissions on products that he sold. Commissions made up approximately two-thirds of Plaintiff's compensation.

Plaintiff worked at Pzifer prior to working at IntraTherapeutics. (*Id*. at 9.) While at Pfizer, Plaintiff selected the option that provided supplemental disability insurance that augmented a basic disability insurance policy and provided disability insurance coverage at 70% of Plaintiff's base salary plus commissions. (*Id*. at 55-56.) Without the supplemental policy, Plaintiff would have been covered at 60% of his base salary plus commissions. (*Id*. at 56.) Plaintiff's insurance coverage at Pfizer ended when he left Pfizer to work at IntraTherapeutics. (*Id*. at 59.) Plaintiff did not consider purchasing supplemental disability insurance when he began work at IntraTherapeutics because he assumed that he would have the same level of insurance coverage as at Pfizer, since he understood it to be standard practice in the industry to provide coverage based on salary plus commissions. (*Id*. at 56.) Plaintiff did not speak with anyone at IntraTherapeutics about long-term disability ("LTD") benefits when he began his employment there. (*Id*. at 56-57, 59.) Plaintiff simply assumed that LTD benefits would include both base salary and commissions. (*Id*. at 59.)

For its LTD plan ("the Plan" or "the LTD Plan") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*., Sulzer purchased group-insurance coverage from Sun Life of Canada ("Sun Life") and adopted the terms of the Sun Life group-

refer to Centerpulse, Sulzer, and Zimmer, collectively, as the Employer Defendants.

insurance LTD policy.[2]  (*See* Doc. No. 46, Ex. B.)  Sulzer acted as Plan Administrator and

"delegated to Sun Life its entire discretionary authority to make all final determinations regarding

claims for benefits under the benefit plan insured by this Policy."  (*Id*. at 28.)  Under the Plan, it

was Sulzer's responsibility to furnish information about plan participants to Sun Life.  (*Id*. at 25.)

Plaintiff was a participant in the Plan and enrolled annually in Sulzer's benefit programs.  (Pl.'s

Dep. 36.)

The Plan provides that an employee's LTD benefits will equal 60% of the employee's

Total Monthly Earnings, up to a Maximum Monthly Benefit of $10,000.00.  (Doc. No. 46, Ex. B

at 4.)  "Total Monthly Earnings" is defined as "the Employee's basic monthly earnings as

reported by the Employer immediately prior to the first date Total or Partial Disability begins.

Total Monthly Earnings does not include commissions, bonuses, overtime pay or any other extra

compensation."  (*Id*. at 10.)

As of March 5, 2001, Plaintiff's base salary was $63,047.92.  (Doc. No. 11, Ex. O.)

Shortly after Sulzer purchased IntraTherapeutics, Sulzer distributed a Total Reward Summary to

its employees, which detailed benefits as of April 1, 2001.  (Pl.'s Dep. 138; Doc. No. 11, Ex. M

("2001 Total Reward Summary").)[3]  The summary was personalized to each employee and

included the employee's hire date, salary, cost of benefits, sick-day accumulation, dental

coverage, and short-term disability and LTD benefits.  (Pl.'s Dep. 138.)  Under the heading

---

[2] The Sun Life LTD policy at issue is Policy Number 99257 and became effective on January 1, 1996.  (*See* Doc. No. 46, Ex. B.)

[3] When Plaintiff filed his Amended Complaint on October 28, 2004, he attached Exhibits A through X.  (*See* Doc. No. 11.)  By stipulation among the parties, Plaintiff filed his Second Amended Complaint on July 24, 2006, and incorporated by reference the exhibits from the first Amended Complaint.  (*See* Doc. No. 36.)

"Disability Benefits," Plaintiff's personalized 2001 Total Reward Summary reported that after six months of disability Plaintiff could be eligible for LTD benefits of $3152.40 per month.[4] (Doc. No. 11, Ex. M.) The 2002 Total Reward Summary, which stated that after six months of disability, he "may be eligible for Long-Term Disability of $5,387.15 per month." (Doc. No. 11, Ex. Q.) Plaintiff testified that based upon these summaries he understood commissions to be included in LTD benefits, because of the dollar amount identified as his LTD benefits.[5] (*Id*. at 138-39.)

On February 2, 2001, Plaintiff was injured in a car accident. (Pl.'s Dep. 33-34.) Plaintiff returned to work approximately one to two weeks after the accident. (*Id*. at 34-35.) He did not consider taking disability leave immediately after the accident because he was being treated by a chiropractor who felt that Plaintiff could fully recover and remain in his job. (*Id*. at 35.) Plaintiff did not immediately discuss LTD benefits with anybody from Sulzer after the accident. (*Id*. at 36.)

On February 21, 2002, Plaintiff received an Employee Handbook. (*Id*. at 50; Doc. No. 46, Ex. C.) Plaintiff signed for the Employee Handbook, but did not read it until May 2002

---

[4] This figure represents 60% of one-twelfth of Plaintiff's base salary or 60% of Plaintiff's monthly earnings based solely on his salary of $63,047.92 and does not include commissions.

[5] Plaintiff does not explain how he reached this conclusion. In any event, Plaintiff was ultimately approved for LTD benefits of $3152.40 per month. (Doc. No. 46, Ex. H.) Plaintiff asserts that "[b]ased upon the calculation set forth in the 2002 handbook, Plaintiff was entitled to a monthly long-term disability benefit of $8622.50, which was sixty (60) percent of his salary and commissions as averages over the previous 24 months." (Doc. No. 37 ¶ 50 (hereinafter, "Second Am. Compl.").)

when he felt that he could no longer work.[6]  (Pl.'s Dep. 61.)  Among other things, the Employee

Handbook described the benefits to which Plaintiff was entitled under the LTD plan.  (Doc. No.

46, Ex. C.)  The Handbook stated that "[t]he amount of insurance is 60% of your Total Monthly

Earnings . . . ."  (*Id.* at 19.)  The term "Total Monthly Earnings," the Handbook explained, "does

include commissions, but does not include bonuses, overtime pay or any other extra

compensation."  (*Id.*)  May 2002 was also the first time that Plaintiff looked at the company's

employee intranet for information on disability benefits.  (Pl.'s Dep. 59-60.)  Because the website

stated that LTD benefits were based on commissions as well as base salary, Plaintiff decided not

to purchase supplemental insurance.  (*Id.*; *see also* Doc. No. 11, Ex. T at unnumbered 13 ("Total

Monthly Earnings does include commissions . . . .").)  After looking at the intranet and the

Employee Handbook and performing some computations, Plaintiff felt that the LTD benefits

were sufficient.  (Pl.'s Dep. 46.)  Plaintiff testified that, had he learned in May 2002 that

commissions were not included, he would have "scrambled" to attempt to purchase a policy that

would cover an "existing condition," because he was injured by that time.  (*Id*. at 70.)

The first time that Plaintiff discussed LTD benefits with anyone from the company was at

the end of May 2002.[7]  (Pl.'s Dep. 36-37, 63.)  At that point, Plaintiff informed his manager,

---

[6] The timeline in this case is not clear.  Plaintiff testified at various points in his deposition that the first time that he looked at the website and Employee Handbook for information on disability benefits was May 2002 (Pl.'s Dep. at 59-60) or October 2002 (*id*. 45-47).

[7] Plaintiff made contradictory statements at his deposition on this subject.  He stated that he discussed LTD benefits with Kim Dickey from human resources in May 2002 (*see* Pl.'s Dep. at 36-37, 63, 69) and that he spoke with Dickey only about short-term disability benefits in May 2002 because he was not at the point of considering LTD at that time (*see id*. at 41-42, 44-45, 139).

Michael Sexton, and his human resources contact, Kim Dickey, that he was experiencing too much pain to continue working.  (*Id*. at 37, 39, 41.)  Plaintiff told Dickey that he needed to take time off to get better; he had not yet considered going out on LTD.  (*Id.* at 41-42.)  Plaintiff learned from Dickey that short-term disability income replacement was calculated using a formula that was predicated on Plaintiff's commissions, as well as his base salary.  (*Id.* at 42.)  Plaintiff remained in regular contact with Dickey during the time-period following the conversation as Dickey was monitored his status.  (*Id.* at 44.)  Plaintiff intended to take time off, get better, and return to work.  (*Id.* at 45.)  As time progressed, however, it became clear that Plaintiff was not getting better and that he was going to have to take long-term disability.  (*Id.*)

Plaintiff's last day of work with the Employer Defendants was May 31, 2002.  (Doc. No. 46, Ex. G ("Long Term Disability Claim Statement").)  Plaintiff began collecting short-term disability benefits on June 3, 2002.  (*Id.*)  He applied to Sun Life for LTD benefits on October 10, 2002.  (Pl.'s Dep. 96; *see also* Doc. No. 46, Ex. G.)  Plaintiff did not read the Summary Plan Description ("SPD") before deciding to apply for LTD benefits because he did not receive an SPD until after he had submitted his application to Sun Life.  (Pl.'s Dep. 51, 90.)  Plaintiff never asked anyone at IntraTherapeutics or Sulzer for an SPD.  (*Id.* at 64.)  Upon receiving his LTD application, Sun Life sent Plaintiff a copy of the August 2002 SPD.  (*Id.* at 63.)  In August 2002, an SPD had been issued that correctly tracked the language of the LTD Plan.  (*See* Doc. No. 46, Ex. D.)  The SPD provided that "Total Monthly Earnings does not include commissions, bonuses, overtime pay or any other extra compensation."  (*Id*., Ex. D at 7.)  Prior to August, the outstanding SPD from January 2002 had been printed with the incorrect statement that Total Monthly Earnings included commissions.  (Doc. No. 46, Ex. F at 4.)  However, by handwritten

6

notation, the SPD had been corrected to state that commissions were not included. (*Id*.) On October 10, 2002, a Summary Material Modification ("SMM") was issued that stated: "The Long Term Disability insurance program Summary Plan Description has been corrected to reflect that commissions are *not* included in the calculation of the monthly disability benefit provided under the Company paid Long Term Disability insurance program." (*Id*., Ex. E (emphasis in original).)

When Plaintiff received the August 2002 SPD from Sun Life in October 2002, he realized for the first time that commissions were not included in LTD benefits. (Pl.'s Dep. 69-70, 88, 93, 96.) Plaintiff called Kim Dickey to ask why his LTD benefits were not being calculated to include commissions as stated on the intranet and in the Employee Handbook. (*Id*. at 92, 96.) Dickey said that she would have to look into it. (*Id*. at 92.) After calling Sulzer's Texas office, Dickey informed Plaintiff that commissions were not included in the LTD policy and that anything that said otherwise was incorrect. (*Id*. at 97.) This information from Dickey corrected the information that she had originally given Plaintiff in May 2002, when she told him that commissions were included when calculating disability benefits. (*Id*. at 98.) Plaintiff continued to communicate with Dickey in order to get the LTD coverage that he expected. (*Id*. at 99.) Sulzer, which by that time had changed its name to Centerpulse, was sold to ev3, Inc., in late November or early December 2002.[8] (*Id*. at 93.) Dickey left the company shortly before this time. (*Id*.) In December 2002, Plaintiff also spoke with Joan Brasier at Sun Life about the misinformation on the intranet and Employee Handbook. (*Id*. at 99-100, 101, 118.) When

---

[8] Plaintiff named ev3, Inc., identified by Plaintiff as "EV3," as a defendant in the Amended Complaint. (Doc. No. 11.) On December 10, 2004, Plaintiff voluntarily dismissed ev3, Inc., from this matter. (Doc. No. 22.)

Plaintiff did not get any positive response from these actions, he gave up pursuing the issue. (*Id*. at 100-01.)

In a letter dated December 4, 2002, Sun Life advised Plaintiff that he had been approved for LTD benefits. (*Id*. at 88, 90; Doc. No. 46, Ex. H.) For the purposes of the Sun Life LTD policy, Plaintiff became disabled on June 1, 2002. (Doc. No. 46, Ex. H.) Plaintiff's benefits began to accrue on November 28, 2002. (*Id*.) The Sun Life letter informed Plaintiff that his Basic Monthly Earnings equaled $5254.00. (*Id*.) Plaintiff's LTD benefits were calculated at 60% of Plaintiff's monthly earnings, or $3152.40 per month. (*Id*.)

Plaintiff's full LTD benefits ended in February 2005, when Sun Life confirmed that Plaintiff was working full-time as a clock repairer. (Doc. No. 46, Ex. I at 4.) At that time, Plaintiff applied for partial disability benefits. (Pl.'s Dep. 114-15.) Plaintiff received a letter from Sun Life informing him that he would not receive partial benefits. (*Id*. at 115.)

Thereafter, Plaintiff found employment with another company in the healthcare industry. (*Id.* at 71.) His present employer provides LTD coverage that includes commissions. (*Id.* at 82.)

Plaintiff filed his Second Amended Complaint on July 24, 2006. In Count I, Plaintiff alleged that Sun Life violated ERISA when it did not pay monthly disability payments based on a calculation of Total Monthly Earnings that included commissions. (Second Am. Compl. ¶¶ 85-117.) In March 2007, Plaintiff settled with Sun Life and a Settlement Agreement and Release was signed. (Doc. No. 46, Ex. K.) Subsequently, Sun Life was dismissed as a defendant in this case. (Doc. No. 45.)

Count II alleges violations of ERISA by the Employer Defendants in their capacities as plan administrators and/or fiduciaries under ERISA. (Second Am. Compl. ¶¶ 118-63.) Plaintiff

also asserts state law claims against the Employer Defendants. In Count IV, Plaintiff alleges negligent or intentional misrepresentation (*id.* ¶¶ 164-83), and in Count V, Plaintiff alleges equitable estoppel (*id.* ¶¶ 184-92).[9]

On April 20, 2007, the Employer Defendants filed a Motion for Summary Judgment. (Doc. No. 46.) Plaintiff filed a response in opposition to Defendants' Motion. (Doc. No. 47.) In his response, Plaintiff also requested partial summary judgment. (*Id.* at 11.)

## II. LEGAL STANDARD

A moving party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Where the non-moving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by "showing" the court that there is no evidence in the record supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). Once the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than

---

[9] Plaintiff's Second Amended Complaint does not contain a Count III.

simply show that there is some metaphysical doubt as to the material facts"); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857-58 (3d Cir. 2000) (explaining that once the movant has demonstrated an absence of a genuine issue of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (noting that plaintiffs cannot avert summary judgment with speculation or by resting on the allegations in the pleadings). "If the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial,' summary judgment is proper as such a failure 'necessarily renders all other facts immaterial.'" *Jakimas v. Hoffmann La Roche, Inc.,* 485 F.3d 770, 777 (3d Cir. 2007) (*quoting Celotex*, 477 U.S. at 322-23). Courts must draw all reasonable inferences from the record in favor of the non-movant. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.4 (3d Cir. 1997). Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc., v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    LEGAL ANALYSIS

### A.    Settlement Agreement and Release with Sun Life

Addressing first the Employer Defendants' motion for summary judgment on all claims based upon Plaintiff's settlement with Sun Life, the Employer Defendants argue that the Settlement Agreement and Release signed by Plaintiff releases all of Plaintiff's claims against the Employer Defendants. (Doc. No. 46 at 21.) Plaintiff responds that the Release only extinguishes Plaintiff's claims against Sun Life. (Doc. No. 47 at 19.) Plaintiff argues that based upon the plain language of the document, "it is clear that Plaintiff intended to settle with Sun Life, only."

(Doc. No. 47 at 19.)

"We construe releases according to principles of state contract law, insofar as state law is consistent with federal objectives." *Gunser v. City of Phila.*, 241 Fed. App'x 40, 42 (3d Cir. 2007) (unpublished) (*citing Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 892 (3d Cir. 1975)). "Under Pennsylvania law, written releases are interpreted in accordance with the rules of contract construction." *A.G. Cullen Constr., Inc., v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1167 (Pa. Commw. Ct. 1997). "In construing a release, the foremost consideration is the intent of the parties." *Id.* "In determining the parties' intent, a court must first look to the language of the release." *Id.*; *see also Williams v. Metzler*, 132 F.3d 937, 947 (3d Cir. 1997) (finding that the inquiry into the intent of the parties "does not require a search for the subjective intent of the parties, but rather centers on the intent embodied in the language that the parties chose to memorialize their agreement"). "The language must be viewed in the context of the entire document." *A.G. Cullen*, 898 A.2d at 1167. "'[S]pecific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject.'" *Id*. at 1168 (*quoting Eighth North-Val, Inc., v. Parkinson Pension Trust*, 773 A.2d 1248, 1255 (Pa. Super. Ct. 2001)). "If a release is unclear on its face, a court must inquire into the circumstances surrounding its execution." *Id*. at 1168 n.2.

The Employer Defendants argue that "multiple key provisions of the Settlement Agreement expressly include the Employer Defendants." (Doc. No. 46 at 24.) The Employer Defendants point to the use of the term "party" or "parties" throughout the document and argue that "never once is [the term] limited to Plaintiff and Sun Life." (*Id*. at 25 n.18.) The Employer Defendants cite as an example a provision of the Agreement that states: "No party to the Civil

Action shall be deemed the prevailing party for purposes of any federal, state or local law, including but not limited to any law regarding the award of attorneys' fees." (Doc. No. 46, Ex. K ¶ 2.) Defendants also cite other similar provisions. We find the Employer Defendants' argument less than persuasive. When one reads the entire Agreement, it is clear and unambiguous that when Plaintiff and Sun Life used the term "party" or "parties" they were referring only to themselves, the signatories to the Agreement.

More compelling is the Employer Defendants' argument that Plaintiff has released his claims against the Employer Defendants based upon the following language: "Plaintiff . . . hereby releases and forever discharges Sun Life and any of its . . . affiliates . . . and all persons acting by, through, under and/or in concert with any of them, of and from any and all rights, actions, causes of action . . . ." (*Id.* ¶ 4.) The Employer Defendants argue that they fit within "the scope of this broad language." (Doc. No. 46 at 22.) They explain that:

> Any action deemed to be by the Plan Administrator of the Plan, was merely 'by' and 'through' Sun Life, to whom Zimmer had delegated its responsibilities and duties. The Employer Defendants were also acting 'under' and 'in concert' with Sun Life because they were involved in elements of the claim process (*e.g.*, accepting and forwarding Plaintiff's application for benefits, providing Sun Life with salary information, etc.).

(Doc. No. 46 at 23.) The Employer Defendants cite *Bennett v. CNA Insurance Company*, No. 99-03127, 2001 U.S. Dist. LEXIS 107 (N.D. Cal. Jan. 5, 2001), in support of their position. (*Id.* at 27.) In *Bennett*, the plaintiff was an employee of Codding Enterprises and participated in Codding's LTD plan. 2001 U.S. Dist. LEXIS 107, at *3. The defendant, Continental Casualty Company, issued a group disability insurance policy to Codding Enterprises. *Id.* Through the policy, for which Codding Enterprises paid premiums, Continental offered LTD benefits to

eligible employees who participated in the LTD plan, such as the plaintiff.  *Id.* at *4.  The

plaintiff was injured and submitted a claim for disability benefits, but disputed the amount of

benefits calculated.  *Id.* at *4-5.  Meanwhile, the plaintiff entered into a Settlement Agreement

and Mutual Release with Codding Enterprises concerning the plaintiff's claims of sexual

harassment and employment discrimination.  *Id.* at *7.  The plaintiff released all claims against

Codding Enterprises and its "agents . . . or any other person or persons . . . or entity acting on

their behalf . . . ."  *Id.*  Later, the plaintiff sued Continental for unpaid LTD benefits.  *Id.* at *1.

The court found that even though Continental was not specifically named in the plaintiff's

settlement with Codding Enterprises, the broad release language constituted a waiver by the

plaintiff of the right to bring an action against Continental.  *Id.* at *11-12.  The court explained

that through the group disability insurance policy on which Codding Enterprises paid premiums,

"Continental, on behalf of Codding Enterprises, provided long-term disability benefits to eligible

employees.  Under this arrangement, Continental is an 'agent' of and an 'entity acting on behalf'

of Codding Enterprises.  Therefore, Continental is released under the plain language of the

Settlement."  *Id.* at *13.  Here, the Employer Defendants argue that they acted "by, through,

under and/or in concert" with Sun Life when they cooperated in connection with the LTD policy

issued by Sun Life.  (Doc. No. 46, Ex. K ¶ 4.)

        We find, however, that the broad release language that arguably includes the Employer

Defendants is clarified and limited in the following paragraph:

> Plaintiff acknowledges that by this Settlement Agreement, it is his intent to release,
> extinguish, waive and relinquish for himself and any person or entity claiming by or
> through him any and all rights to sue or bring claim against Sun Life including but
> not limited to any claim arising from or related in any way to the claims advanced in
> the Civil Action.

(*Id*. ¶ 5.)  Clearly, the parties' intentions, as expressed in the language of the Agreement, were that Plaintiff would relinquish his claims against Sun Life.  *See A.G. Cullen*, 898 A.2d at 1168 ("Contrary to the general language relied on by the State System, the release also contains specific language that demonstrates an intent to limit its effect to the parties and claims at issue in A.G. Cullen's suit against Cooper Trading.").  Accordingly, we conclude that Plaintiff did not release his claims against the Employer Defendants when he settled with Sun Life.

B.      **ERISA Claims**

Addressing next Plaintiff's ERISA claims, in Count II of the Second Amended Complaint, Plaintiff alleges that the Employer Defendants violated ERISA.  (Second Am. Compl. ¶¶ 118-63.)  Plaintiff does not identify any particular enforcement provision under ERISA, except to state that "[p]ursuant to 29 U.S.C. § 1132(a), Plaintiff is entitled to recover all amounts due and owing for Defendants' failure to make payments to him as required under the Summary Plan Description published and circulated to all employees."  (*Id.* ¶ 161.)  Plaintiff also alleges that the Employer Defendants breached their fiduciary duties under ERISA.

In their Motion for Summary Judgment, the Employer Defendants treat Plaintiff's Second Amended Complaint as asserting two claims:  a claim for benefits under 29 U.S.C. § 1132(a)(1)(B); and a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3).  (Doc. No. 46 at 9.)  Plaintiff does not challenge this treatment of his Second Amended Complaint. However, Plaintiff's response does not make clear which arguments and facts pertain to which claims.  The Employer Defendants seek summary judgment on Plaintiff's benefits claim under § 1132(a)(1)(B) and Plaintiff's breach of fiduciary duty claim under § 1132(a)(3).

1.      *29 U.S.C. § 1024(b)(1)(A)*

In Plaintiff's response to the Employer Defendants' Motion for Summary Judgment,

Plaintiff argues that the Employer Defendants violated 29 U.S.C. § 1024 by failing to distribute

SPDs as required by the statute.  (Doc. No. 47 at 13.)  Plaintiff asserts that "[t]his blatant

violation of the notice requirements, without need for a written or oral request due to the

statutory obligation, requires the court to determine if the Employer Defendants should be

responsible for the statutory penalty of up to $100 per day for each day in which the SPD was not

provided to [Plaintiff]."  (*Id*. at 16.)  The Employer Defendants respond that Plaintiff's Second

Amended Complaint does not state a claim for failure to provide Plan documents, but that, even

if it did, Plaintiff cannot establish the elements necessary to survive summary judgment on such a

claim.  (Doc. No. 50 at 2-3.)

Initially, we must determine whether Plaintiff properly raised this claim in the Second

Amended Complaint.  "A plaintiff may not amend [his] complaint through argument in a brief

opposing summary judgment."  *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15

(11th Cir. 2004); *see also Bell v. City of Phila.*, 275 Fed. App'x 157, 160 (3d Cir. 2008)

(unpublished) ("A plaintiff 'may not amend his complaint through arguments in his brief in

opposition to a motion for summary judgment.'" (*quoting Shanahan v. City of Chi.*, 82 F.3d 776,

781 (7th Cir. 1996))).  In Count II of the Second Amended Complaint, Plaintiff states that

"Defendants have violated ERISA in that they did not properly distribute Summary Plan

Descriptions and/or policies to the participants of the plan."  (Second Am. Compl. ¶ 140.)  This

allegation was made in the context of Plaintiff's breach of fiduciary duty claim under 29 U.S.C.

§ 1132(a)(3).  (*See, e.g.*, *id*. ¶ 129 ("The Employer Defendants failure to provide summary plan

descriptions and/or copies of the policy were breaches of their fiduciary duties under ERISA.").)

Plaintiff did not make any reference to the provisions within ERISA that require plan administrators to furnish an SPD to each plan participant. Nevertheless, we will assume that Plaintiff asserted a separate claim against the Employer Defendants for failure to provide plan documents.

Section 1024(b)(1)(A) requires that the plan administrator shall furnish a copy of the SPD to each plan participant "within 90 days after he becomes a participant . . . ." *Id*. § 1024(b)(1)(A). Section 1024(b)(1)(A) does not require a plan participant to request a copy of the SPD in order to trigger the plan administrator's duty to furnish the SPD. *See, e.g.*, *Crotty v. Cook*, 121 F.3d 541, 547 (9th Cir. 1997) ("The administrator of the plan was obligated to furnish [the plan participant] with the summary plan description at specified times, without the need for any request by [the plan participant]." (*citing* 29 U.S.C. § 1024(b)(1))); *Colarusso v. Transcapital Fiscal Sys., Inc. Top-Hat Value Added Plan*, 227 F. Supp. 2d 243, 257 (D.N.J. 2002) (finding that under § 1024(b)(1), "no requests need be made at all to trigger a plan administrator's duty to provide such information"). The regulations provide detailed instructions for disclosure of plan documents by "measures reasonably calculated to ensure actual receipt of the material by plan participants . . . ." 29 C.F.R. § 2520.104b-1(b)(1). The regulations also provide instructions for disclosure of plan documents through electronic media. *Id*. § 2520.104b-1(c)

Sulzer was designated as the Plan Administrator in the Plan documents. (*See* Doc. No. 46, Ex. B at 28); *see also* 29 U.S.C. § 1002(16)(A)(i) ("The term 'administrator' means . . . the person specifically so designated by the terms of the instrument under which the plan is operated

. . . .'"). It was Sulzer's responsibility as Plan Administrator to furnish copies of the SPD within

90 days of the IntraTherapeutics employees becoming participants in the Sun Life plan. *See* 29

U.S.C. § 1024(b)(1)(A). Plaintiff testified at his deposition that the first time that he received an

SPD was in October 2002, when Sun Life sent him an SPD in response to his LTD application.[10]

(Pl.'s Dep. 51, 90.) Renee Rogers, the corporate designee for the Employer Defendants, testified

at her deposition that she did not know how SPDs were delivered to Sulzer employees. (Doc.

No. 47, Ex. C at 43 (hereinafter, "Rogers Dep."); *see also id*. at 65 ("I don't remember

specifically distribution in paper form, how or when it happened.").) Based on the present state

of the record, we assume for purposes of this motion that there was a violation of

§ 1024(b)(1)(A). What is the remedy? Several courts that have addressed this issue have

concluded that there is "no specific provision providing specific relief for a violation" of 29

U.S.C. § 1024(b)(1). *Simeon v. Mount Sinai Med. Ctr.*, 150 F. Supp. 2d 598, 604 (S.D.N.Y.

2001); *see also Carder-Cowin v. UNUM Life Ins. Co. of Am.*, 560 F. Supp. 2d 1006, 1014 (W.D.

Wash. 2008) ("[W]here there has been no request for the information, courts have determined

---

[10] Throughout his brief in opposition, Plaintiff identifies, without explanation, the postings on the employee intranet as an SPD. (*See, e.g*, Doc. No. 47 at 9, 17.) Rogers testified at her deposition that she was not aware if the posting on the intranet was connected with an SPD. (Rogers Dep. at 42.) She also testified that, at some point, Sulzer moved from distributing paper copies of the SPD to placing the SPD on the intranet. (*Id*. at 65-66.) Based on a review of the intranet postings present in the record (*see* Doc. No. 11, Ex. T), it appears that the intranet postings do contain many elements that are required to be included in SPDs. *See* 29 U.S.C. § 1022(b) (describing the information that must be contained within an SPD); *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1316 (3d Cir. 1991) (outlining the categories of information that must be included in an SPD under 29 U.S.C. § 1022(b)); 29 C.F.R. § 2520.102-3 ("Contents of summary plan description"). However, neither party has enlightened us concerning the status of the intranet postings. If the intranet postings somehow constituted an SPD, there has been no evidence offered to show that distribution of the SPD via the intranet complied with the regulations governing electronic distribution. *See* 29 C.F.R. § 2520.104b-1(c) ("Disclosure through electronic media").

that "[t]here is no specific [ERISA] provision providing specific relief for a violation of this duty.'"); *Colarusso*, 227 F. Supp. 2d at 260 (finding that with regard to a plan administrator's failure to distribute documents under § 1024(b)(1), "there are no specific penalty provisions for such a failure").

Plaintiff seeks relief in the form of a civil penalty of $100 per day. Section 1132(c)(1)(B) of the Act provides for such a penalty, but § 1132(c)(1)(B) applies only when a plan administrator fails or refuses to comply with a request for documents. 29 U.S.C. § 1132(c)(1)(B);[11] *see also Romero v. SmithKline Beecham*, 309 F.3d 113, 119-20 (3d Cir. 2002) ("[S]ection [1132](c)(1) requires actual receipt [of a request] by the administrator. This interpretation is supported by the statute's reference to an administrator 'who . . . fails or refuses to comply with a request for . . . information.' It is not customary to refer to a person's failure or refusal to comply with a request that has never been received." (*quoting* 29 U.S.C. § 1132(c)(1)(B))); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167 (3d Cir. 1990) (finding that liability under § 1132(c) "cannot be imposed unless and until a participant requests

---

[11] Section 1132(c)(1)(B) provides:

Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in . . . subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1).

from the administrator the information to which he claims entitlement, and the administrator fails to comply with the request for at least 30 days." (*citing* 29 U.S.C. § 1132(c)(1)(B))). Plaintiff has not alleged, nor provided any evidence, that he ever requested any information from the Employer Defendants or that they failed to comply with any such request. Accordingly, Plaintiff cannot collect civil penalties under § 1132(c)(1)(B).[12]

"[U]nder ordinary circumstances defects in fulfilling the reporting and disclosure requirements of ERISA do not give rise to a substantive remedy other than that provided for in section [1132](a)(1)(A) of that Act." *Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir. 1995). Section 1132(a)(1)(A) provides that a participant may bring a civil action "for the relief provided in subsection (c) of this section." 29 U.S.C. § 1132(a)(1)(A). However, as discussed above, § 1132(c)(1), which is the only subsection potentially applicable in this situation, does not provide relief in cases where a request for information has not been made. Several courts have found that in the absence of a particular provision providing relief for violations of § 1024(b)(1)(A), courts have the discretion to provide appropriate equitable relief under § 1132(a)(3).[13] *See, e.g.*, *Carder-Cowin*, 560 F. Supp. 2d at 1014-15 (finding that "the Court in

---

[12] At least one court has held that courts may impose penalties under 29 U.S.C. § 1132(a)(1)(B) under the authority to impose equitable relief. In *Colarusso*, the court found that "where . . . a plan administrator fails to provide a plan participant with information ERISA requires the plan administrator to automatically furnish and there are no specific penalty provisions for such failure, pursuant to 29 U.S.C. § 1132(a)(3), a court may impose any appropriate equitable relief, including penalties under 29 U.S.C. § 1132(c)(1)(B)." *Colarusso*, 227 F. Supp. 2d at 260 (*citing Simeon*, 150 F. Supp. 2d at 603-04). The *Colarusso* court explained that "[t]he exercise of such discretion by this Court does not ignore the plain language of 29 U.S.C. § 1132(c)(1)(B), but rather adopts its penalty provision to remedy an ERISA violation for which no other specific recourse is provided." *Id.*

[13] Section 1132(a)(3) states that

19

its discretion may, but is not required to, provide equitable relief for a procedural violation of § 1024(b)(1)," but that "on the facts presented in the record, the Court declines to award plaintiff equitable relief"); *Colarusso*, 227 F. Supp. 2d at 260 (finding that because there are no specific penalty provisions for a violation of § 1024(b)(1), "pursuant to 29 U.S.C. § 1132(a)(3), a court may impose any appropriate equitable relief"); *Simeon*, 150 F. Supp. 2d at 604 (finding that because "[t]here is no specific provision providing specific relief for a violation of this duty . . . there is nothing that precludes equitable relief for a violation of 29 U.S.C. § 1024(b)(1)").  The Third Circuit has determined, however, that in the absence of extraordinary circumstances, equitable relief is not available to redress disclosure violations.  *See, e.g.*, *Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 74 (3d Cir. 2007) (denying appellants' request for appropriate equitable relief because "'substantive remedies are generally not available for violations of ERISA's reporting and disclosure requirements' except 'where the plaintiff can demonstrate the presence of extraordinary circumstances'" (*quoting Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1011 (3d Cir. 1997))).  Plaintiff has not alleged extraordinary circumstances and we do not find them in the record.  Accordingly, the Employer Defendants are entitled to summary judgment on any claims made by Plaintiff for civil penalties.

2.       *29 U.S.C. § 1132(a)(1)(B)*

Section 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or

---

[a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).

20

beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). "A plaintiff seeking to recover under Section [1132](a)(1)(B) must demonstrate that the benefits are actually due; that is . . . [he] must have a right to benefits that is legally enforceable against the plan." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 574 (3d Cir. 2006) (*citing* 29 U.S.C. § 1132(a)(1)(B)) (internal quotations marks omitted).

Even though Plaintiff appears to be seeking benefits under § 1132(a)(1)(B), Plaintiff's Second Amended Complaint does not clearly state such a claim. Plaintiff does not argue that he was wrongfully denied benefits, or even that benefits are due to him under the Sun Life policy.[14] Plaintiff asserts that

> [t]he issue here is not the amount of benefits due under the Policy. The Policy is abundantly clear. It does not provide for inclusion of commissions in Total Monthly Earnings. The issue here is what happens when the Plan Administrator and Sponsor repeatedly provides inaccurate information which causes a participant to believe that commissions are included – particularly when commissions make up two-thirds of that individual's compensation.

(Doc. No. 47 at 23.) Therefore, Plaintiff's benefits claim is, essentially, an argument that the Employer Defendants are liable to Plaintiff for additional benefits because he was misled into believing that he would receive such benefits.[15]

---

[14] Accordingly, this is not a case where a traditional denial of benefits claim is being repackaged as a breach of fiduciary duty claim. *See Varity Corp. v. Howe*, 516 U.S. 489, 513 (1996) ("Consider a plan administrator's decision not to pay for surgery on the ground that it falls outside the plan's coverage. . . . [W]hat will happen . . . if a beneficiary can repackage his or her 'denial of benefits' claim as a claim for 'breach of fiduciary duty?'"). To some extent, this case exemplifies the opposite occurrence: a breach of fiduciary duty being repackaged as a denial of benefits claim.

[15] Plaintiff's argument concerning the appropriate defendant for a § 1132(a)(1)(B) claim supports this understanding. Plaintiff argues that because "Sun Life's policy provided clearly for

In any event, § 1132(a)(1)(B) does not provide Plaintiff with relief.  Plaintiff argues that because there were documents – which Plaintiff identifies as SPDs without much explanation – that conflicted with the Sun Life Plan, the purported SPDs controlled.  (Doc. No. 47 at 17.)  However, by the time Plaintiff was entitled to LTD benefits, the SPD and Plan documents clearly indicated that benefits would be calculated on the basis of salary alone.  *See Hooven*, 465 F.3d at 578 ("By the time that Plaintiffs would have become entitled to benefits under section [1132](a)(1)(B), the SPD and CIC Plan were consistent; both made clear that employees in Plaintiffs' position were not entitled to benefits.").  Therefore, when Plaintiff's LTD benefits were calculated without including the value of his commissions, Plaintiff's benefits were calculated correctly under the terms of the Plan.  Plaintiff admits as much in his brief in opposition to the Employer Defendants' motion for summary judgment.  (*See* Doc. No. 47 at 20-21 ("There is no question that [Plaintiff] was 'due' benefits under the plan for purposes of § 1022(a)(1)(B) [sic].  Sun Life, the claims administrator, determined he was totally disabled under the terms of the policy and was paid benefits *in accordance with* the policy it issued to the Employer Defendants.") (emphasis added).)  The Third Circuit's decision in *Hooven* is instructive.  465 F.3d at 578.  In *Hooven*, the plaintiffs "protested . . . that holding that they were not entitled to benefits [under § (a)(1)(B)] . . . would leave them without a remedy for [the defendant's] material omission in the Initial SPD."  *Id.*  The Third Circuit found the plaintiffs' concerns to be misplaced because "employees injured by a mistake in a summary plan description have 'a panoply of remedial devices at [their] disposal.'"  *Id.* (*quoting Mass. Mut.*

---

payment of benefits without including commissions in the calculations of Total Monthly Earnings . . . [it] cannot be responsible for benefits which would include commissions when Sun Life had nothing to do with the creation and distribution of the SPD."  (Doc. No. 47 at 19.)

*Life Ins. Co. v. Russell*, 474 U.S. 134, 146 (1985)).  For example, "any plaintiff who has relied on an inaccurate or misleading term of an SPD to his or her detriment can recover on a claim for breach of fiduciary duty . . . ."  *Id.* (*citing Burstein*, 334 F.3d at 387).  Since Plaintiff was paid the benefits to which he was entitled under the Plan as the Plan existed when he became eligible for the LTD benefits, Plaintiff's claim under § 1132(a)(1)(B) must fail.

### 3.     *29 U.S.C. § 1132(a)(3)*

Plaintiff argues that the Employer Defendants breached their fiduciary duty under ERISA by distributing inaccurate information about the LTD benefits.  (Doc. No. 47 at 22.)  Plaintiff asserts that he

> detrimentally relied on the misleading provision of the SPDs believing he was covered sufficiently.  Had he known that he would only have received Long-Term Disability benefits for 60% of his $68,000 base salary, he would have purchased additional coverage.  It never occurred to him that commissions would not have been included, as that was the industry standard and what his previous employers had all offered.

(*Id.*)  The Employer Defendants move for summary judgment on this claim on several grounds: (1) 29 U.S.C. § 1132(a)(3) is not available to Plaintiff because adequate relief is available through § 1132(a)(1)(B) (*see* Doc. No. 46 at 15); (2) Plaintiff cannot establish that he detrimentally relied on the inaccurate information (*see id.* at 17-19); and (3) Plaintiff seeks impermissible legal relief (*id.* at 14-15).

### (a)     Availability of 29 U.S.C. § 1132(a)(3)

As an initial matter, the Employer Defendants argue that "§ 1132(a)(3) is a 'catch-all provision that cannot be used when § 1132(a) already provides a remedial provision."  (Doc. No. 46 at 15 (*citing, inter alia*, *Varity Corp. v. Howe*, 516 U.S. 489 (1996)).)  Plaintiff did not

address this argument in his brief in opposition.

Under 29 U.S.C. § 1132(a)(3), "ERISA provides plan participants an equitable cause of action for an administrator's breach of fiduciary duty." *Jordan v. Fed. Express Corp.*, 116 F.3d 1005, 1012 (3d Cir. 1997). Section 1132(a)(3) states that

> [a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3). In determining whether § 1132(a)(3) is available to plan participants, courts look to the Supreme Court decision in *Varity Corp. v. Howe*, 516 U.S. 489 (1996) for guidance. "[T]he great majority of circuit courts have interpreted *Varity* to hold that a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)." *Korotynska v. Met. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (collecting cases). The Court in *Varity* explained that § 1132(a)(3) "authorizes '*appropriate*' equitable relief. . . . [W]e should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Varity*, 516 U.S. at 515 (emphasis in original). Courts have thus held that where "§ 1132(a)(1)(B) affords the plaintiff adequate relief for [his] benefits claim . . . a cause of action under § 1132(a)(3) is . . . not appropriate." *Korotynska*, 474 F.3d at 107. As discussed above, § 1132(a)(1)(B) does not provide Plaintiff with relief. Accordingly, we will address Plaintiff's claim under § 1132(a)(3).

### (b)    29 U.S.C. § 1132(a)(3) Elements

Plaintiff's § 1132(a)(3) claim is premised on his alleged detrimental reliance upon the

inaccurate LTD benefits information found in the Handbook and on the employee intranet, as well as the allegedly misleading Total Rewards Summary. (Doc. No. 47 at 17-22.) The Employer Defendants argue that "[t]here is no evidence that Plaintiff detrimentally relied on any of the materials he allegedly received which reflect that LTD benefits would be paid on a salary plus commissions basis. To the contrary, Plaintiff admits that he never considered the terms of the LTD Plan until *after* he decided to take disability leave." (Doc. No. 46 at 17 (emphasis in original).)

To establish a breach of fiduciary duty for a misrepresentation, a plaintiff must establish: "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation." *Daniels v. Thomas & Betts Corp.*, 263 F.3d 66, 73 (3d Cir. 2001); *see also Burstein*, 334 F.3d at 387 (same). "'[W]hen a plan administrator explains plan benefits to its employees, it acts in a fiduciary capacity.'" *UAW v. Skinner Engine Co.*, 188 F.3d 130, 148 (3d Cir. 1999) (*quoting In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1261 n.10 (3d Cir. 1995)). "[A] fiduciary may not materially mislead those to whom the duties of loyalty and prudence are owed." *Id.* (*quoting Unisys*, 57 F.3d at 1261). "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making a decision regarding his benefits under the ERISA plan." *Daniels*, 263 F.3d at 73.

When the Employer Defendants – who are identified as the Plan Administrators under the terms of the Plan (*see* Doc. No. 46, Ex. B at 28) – created and distributed the Employee Handbook and Total Reward Summaries and established the employee intranet, they were acting

in their capacities as Plan Administrators to explain plan benefits to employees. As a consequence, the Employer Defendants were acting in a fiduciary capacity and owed fiduciary duties. It is undisputed that the statements in the Employee Handbook and the intranet concerning the calculation of LTD benefits were inaccurate.[16] For purposes of this summary judgment motion, we accept that these inaccuracies constituted material misrepresentations. Employees in Plaintiff's position earned two-thirds of their compensation through commissions. In situations where LTD benefits are based upon percentages of employee compensation, a representation that commissions are included in benefits calculations would lead a reasonable employee to believe that his LTD benefits would be significantly higher than if commissions were not included. The significant difference in coverage would clearly affect how employees make decisions about ERISA benefits, and decisions about employment options related to those ERISA benefits.

The parties' main dispute centers on whether Plaintiff has demonstrated detrimental reliance on the inaccurate information distributed by the Employer Defendants. In the Second Amended Complaint, Plaintiff alleged that he detrimentally relied on information provided by the Employer Defendants when he discontinued supplementary disability coverage because he learned that Defendants' LTD Plan included both base salary and commissions. Plaintiff further alleged that he detrimentally relied on the "Summary Plan Descriptions" in the February 2002

_____

[16] We do not decide whether the Total Reward Summaries were misleading. The 2001 Total Reward Summary apparently reflected the correct amount of benefits owed under the LTD Plan. The 2002 Total Reward Summary, while stating that Plaintiff would be entitled to more than the amount stated in the 2001 document, still offered a figure significantly less than Plaintiff states that he is owed when commissions are included. Plaintiff has failed to present evidence or argument as to how the Total Rewards Summaries were misleading.

Employee Handbook and on the company intranet when he decided not to purchase additional LTD coverage.

To the extent that Plaintiff's breach of fiduciary duty claim is based upon the allegation that he did not purchase supplemental insurance prior to May 2002 in reliance on the Employer Defendants' misrepresentations, this claim is not supported in the record. Plaintiff testified at his deposition that he did not purchase supplemental insurance when he left Pzifer and began work at IntraTherapeutics, and then Sulzer, because he simply assumed that LTD coverage would include both salary and commissions. (*See* Pl.'s Dep. 56-59.) There was no reliance. Similarly, to the extent that Plaintiff claims that he detrimentally relied upon information from Defendants in deciding to terminate his supplemental LTD coverage, such a claim is contradicted by evidence in the record. Plaintiff testified at his deposition that the supplemental insurance coverage was a benefit from Pzifer, and that it ended when his employment with Pzifer ended. (*Id*. at 59.) He testified that he did not terminate the coverage on the basis of any information received from the Employer Defendants. (*Id*. at 58.)

Plaintiff also claims that he was mislead into not purchasing supplemental insurance when he looked at the Employee Handbook and employee intranet, both of which stated that commissions were included in the calculation of LTD benefits. It is not disputed that the earliest that Plaintiff might have looked at the LTD materials offered by the Employer Defendants was May 2002. Plaintiff looked at the Employee Handbook for the first time in May 2002 because his injury was causing him so much pain that he could no longer work. (*See* Pl.'s Dep 61 ("You know I signed for [the Employee Handbook] in February of 2002, but didn't – had no need to review what was in there at the time until May when I couldn't work any longer.").) Plaintiff

himself recognized that finding supplemental disability insurance coverage for a person who was already injured would be problematic:

> Q.      [I]f you had learned that [commissions were not included] in May of 2002, would you have done anything differently?
>
> A.      Yes.  I would have scrambled, and hoped that I could have gotten a policy that would cover me for a quote, unquote, existing condition because now I've been injured.
>
> Q.      So you agree that because of the injury it may have been difficult to obtain that sort of coverage?
>
> A.      I didn't explore it, so I don't know.

(*Id*. at 70.)  The Employer Defendants argue that "[n]o insurer would have underwritten a supplemental disability policy for someone who was totally disabled. . . . [If] Plaintiff . . . could no longer work, in any capacity, it defies common sense to conclude that Plaintiff could have purchased supplemental insurance in the summer of 2002 . . . ."  (Doc. No. 50 at 9.)  We agree.  At the time that Plaintiff examined the LTD information, Plaintiff was severely injured and could not work.  This is what prompted him to look at the disability insurance benefits information in the first place.  Moreover, for purposes of the LTD policy, Plaintiff was determined to be totally disabled as of June 1, 2002.  (*See* Doc. No. 46, Ex. H.)  Even if Plaintiff had learned in May 2002 that the information in the Employee Handbook and on the intranet was incorrect, Plaintiff's injury and total disability would have made it impossible for him to obtain supplemental disability insurance.  The reality here is that there was no detrimental reliance.  Without detrimental reliance, Plaintiff cannot establish a claim for breach of fiduciary duty under § 1132(a)(3).

(c)      <u>Equitable Relief</u>

The Employer Defendants also argue that summary judgment should be granted in their favor because "ERISA § 1132(a)(3) cannot be used to recover monetary legal relief. The Complaint does not seek equitable relief; it only seeks damages in the guise of 'benefits' *not* provided by the Plan from alleged 'fiduciaries' based upon their improper conduct." (Doc. No. 46 at 14-15 (emphasis in original).) Plaintiff did not address this issue.

"[Section 1132](a)(3), by its terms, only allows for *equitable* relief." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 221 (2002) (emphasis in original); *see also Leckey v. Stefano*, 501 F.3d 212, 230 (3d Cir. 2007) ("The real impediment to awarding relief under § 1132(a)(3) is that only traditional equitable remedies are available." (*citing Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993))). "Legal remedies, like money damages – and even *legal* restitution – are not allowed." *Leckey*, 501 F.3d at 230 (*citing Great-West*, 534 U.S. at 213) (emphasis in original); *see also id.* at 230 ("[N]ot all restitutionary remedies were traditionally available in equity; rather equity would restore only 'money or property identified as belonging in good conscience to the plaintiff [that] could be easily traced to particular funds or property in the defendant's possession.'" (*quoting Great-West*, 534 U.S. at 213)). "A remedy involving payments is permissible so long as those payments would have historically been available in courts of equity." *Pell v. E.I. Dupont de Nemours & Co. Inc.*, 539 F.3d 292, 307 (3d Cir. 2008) (*citing Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356, 362-63 (2006)). Where, for example, a plaintiff seeks to recover funds that have "been set aside and [are] specifically identifiable, . . . [the plaintiff] could recover through the traditional equitable remedies of constructive trust or equitable lien." *Id.* (*citing Sereboff*, 547 U.S. at 362-63). On the other hand, "injunctions are legal remedies if they 'compel the payment of money past due under a contract, or specific

29

performance of a past due monetary obligation, [a remedy that] was not typically available in equity." *Id.* (*quoting Great-West*, 534 U.S. at 210-11) (alteration in original).

Plaintiff's request for payment of the difference between LTD benefits as calculated with and without commissions certainly appears to be a request for legal relief. There is no evidence that specifically identifiable funds have been set aside from which payment would be made through traditional equitable remedies. Plaintiff is not entitled to the requested legal relief under 29 U.S.C. § 1132(a)(3).

### C.    Plaintiff's Motion for Partial Summary Judgment

As discussed above, in his response to the Employer Defendants' Motion for Summary Judgment, Plaintiff makes a motion for partial summary judgment. (*See* Doc. No. 46 at 11.) Plaintiff does not specify on which claim or claims he is moving for partial summary judgment. Except for a recitation of summary judgment legal standards, Plaintiff's argument on the subject is as follows:

> Plaintiff is entitled to partial summary judgment. Even when viewed in a light most favorable to the Employer Defendants, there is no evidence that an accurate SPD was provided. The terms of the SPD and the plan conflicted. When that occurs, the SPD controls and therefore, [Plaintiff] is entitled to judgment as a matter of law. When Defendants' arguments are viewed in the light most favorable to them, it is clear that they are not entitled to judgment as a matter of law.

(Doc. No. 47 at 13.) This argument could refer to all three of Plaintiff's claims under ERISA.

When a movant in a summary judgment motion bears the burden of proof at trial, the movant has "the burden of supporting [his] motion 'with credible evidence . . . that would entitle [him] to a directed verdict if not controverted at trial.'" *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (*quoting Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)); *see also El v.*

*Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) ("[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to finds its way on the facts needed to rule in its favor on the law.").  If "the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."  *Nat'l State Bank v. Fed. Reserve Bank of N.Y.*, 979 F.2d 1579, 1582 (3d Cir. 1992) (internal quotation marks omitted).

    1.  *29 U.S.C. § 1024(b)(1)(A)*

  Plaintiff's motion for partial summary judgment on the § 1024(b)(1)(A) claim is denied.  As discussed above, we assume for purposes of this motion that the record reflects that the Employer Defendants failed to distribute SPDs as required by § 1024(b)(1)(A).  Nevertheless, we are compelled to deny summary judgment in Plaintiff's favor.  There is no relief that we can grant for a violation of § 1024(b)(1)(A).  Plaintiff has not demonstrated that he is entitled to any equitable relief due to a violation of this provision, let alone equitable relief that is only permitted in extraordinary circumstances.

    2.  *29 U.S.C. § 1132(a)(1)(B)*

  Plaintiff's motion for partial summary judgment on the § 1132(a)(1)(B) claim is denied.  Plaintiff is not entitled to additional benefits under the LTD Plan.

    3.  *29 U.S.C. § 1132(a)(3)*

  Plaintiff's motion for partial summary judgment on the § 1132(a)(3) is denied.  A reasonable juror would not be compelled to find in Plaintiff's favor on this matter, because Plaintiff has not demonstrated detrimental reliance.  Moreover, Plaintiff has not requested

equitable relief.

**D.     State Law Claims**

In the Second Amended Complaint, Plaintiff asserts claims for negligent and intentional misrepresentation (Count IV) and equitable estoppel (Count V).  The Employer Defendants move for summary judgment on these claims, arguing that ERISA completely preempts Plaintiff's state law claims.  (Doc. No. 46 at 19.)  Furthermore, the Employer Defendants argue that even if the Court construes Plaintiff's equitable estoppel claim as arising under federal common law, the Employer Defendants are entitled to summary judgment because Plaintiff has not demonstrated "extraordinary circumstances."  (*Id*. at 21 n.16 (*quoting Hooven*, 465 F.3d at 578).)  Plaintiff does not address these arguments or put forth any other arguments in support of these claims. Accordingly, we will grant summary judgment in favor of the Employer Defendants on these claims.  *See Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (granting summary judgment because plaintiff failed to address one of the defendant's arguments in his summary judgment motion, which resulted in the plaintiff's waiver of the opportunity to contest summary judgment on that ground).

**IV.     CONCLUSION**

For all of these reasons, we will grant summary judgment on all of Plaintiff's claims in favor of the Employer Defendants.  The Second Amended Complaint will be dismissed.

An appropriate Order will follow.

BY THE COURT:


/s/ *R. Barclay Surrick*, J.
